## AUTOMATIC DIALING CORP. v. MARITIME QUALITY HARDWARE CO. et al.

### No. 736.

United States District Court
D. Maine, S. D.
July 2, 1951.

---

17. See footnote 15.

Sidney W. Wernick, Edward J. Berman, Portland, Me., for plaintiff.

George F. Peabody, Bangor, Me., for defendant Maritime Quality Hardware Co.

Edward G. Griffin, Agency Counsel, Boston, Mass., for defendant Reconstruction Finance Corp.

Edward Richards, Providence, R. I., and Leonard A. Pierce, and Edward W. Atwood, Portland, Me., for intervenor Sandsea, Inc., now Anchor Tool and Die Co.

CLIFFORD, District Judge.

This case arose as the result of the breakdown of a contract relationship, originally between Automatic Dialing Corporation (Autodial), a Deleware Corporation, and Maritime Quality Hardware Company, Inc., (Maritime) a Maine Corporation, concerning the manufacture of twelve pilot, or production, units of a device known as the teledial.

The case came to this Court on Autodial's complaint that Maritime had broken the contract. Autodial asked this Court, in the alternative, either to order specific performance of the contract, or to order Maritime to deliver to Autodial all the completed work done under the contract and to assess damages against Maritime for the breach. Maritime answered, denying any breach of contract on its part, and asserting instead that Autodial had made performance of the contract impossible and that the parties had entered into a new agreement, supplanting the original one which Autodial had broken. Maritime also filed a counterclaim based on the alleged new contract, asking for damages for Autodial's alleged breach, or, in the alternative, for specific performance of the new contract, and for an order enjoining Autodial from using any of the work already completed by Maritime, pending decision of the case. This Court has heretofore entered its opinion and order denying Maritime's request for an injunction, D.C., 78 F.Supp. 558.

This Court, thereafter, granted the motion of Sandsea, Inc., a Rhode Island corporation, to intervene in the action. Sandsea, Inc., filed claims for damages against both Autodial and Maritime, for work done by it, under contracts with the other two parties, in connection with the teledial project. It has been stipulated that the corporate name of Sandsea has been changed to Anchor Tool and Die Company, since the date when the petition to intervene was granted. The Intervenor's name has been changed on the docket; but for convenience, however, the Intervenor will be referred to herein as Sandsea, Inc.

Maritime has admitted liability to Sandsea, Inc., as alleged by the Intervenor. Autodial filed an answer denying the claim of Sandsea, Inc., as to it.

Hearing on the merits was had before the Court without a jury. At the outset

of the hearing, Autodial took a voluntary nonsuit in its case against Maritime. The hearing proceeded on Maritime's counterclaim against Autodial, and on the claim of Sandsea, Inc., against Autodial. Exhaustive testimony was taken, numerous exhibits were filed with the Court, and extensive briefs have been submitted to the Court by all parties.

At the outset, counsel for Autodial raise a question as to the capacity of Maritime to prosecute its counterclaim, in view of the Real Party in Interest Rule, Rule 17 (a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Plaintiff's Exhibit "A" is a certified copy of an assignment, dated April 11, 1947, from Maritime to the Reconstruction Finance Corporation, of all of Maritime's interest in moneys due or to become due from Autodial, under the contract here in issue. The Reconstruction Finance Corporation (R.F.C.) was given the right to receive, collect, sue for and receipt for such money. Under the circumstances, Rule 17(a) applies, and the counterclaim should have been prosecuted in the name of the R.F.C., as the real party in interest.

Since the hearing, this Court has received from counsel for the R.F.C. a statement that that agency consents to submit to the jurisdiction of this Court, to be joined as a party to the counterclaim in the present action. This Court considers that the consent of the R.F.C. in this regard is a highly commendable step, in eliminating the possibility of a rehearing of the evidence in this somewhat complex case.

It is in the interest of justice to all parties that the R.F.C. be made a party to the present action, thus meeting the requirements of the Real Party in Interest Rule, and concluding the case for all the parties concerned. Therefore, by virtue of the authority vested in it by Rules 13(h) and 21 of the Federal Rules of Civil Procedure, this Court will order that the R.F.C. be joined as a defendant herein. For convenience in discussing the facts and issues of the case, this Court will not reiterate the interest of the R.F.C. in Maritime's counterclaim against Autodial; but with respect to the counterclaim, it will be understood that the R.F.C. is included in all references to Maritime. It is to be noted that the R.F.C. is not concerned in the claim of Sandsea, Inc., against Maritime.

Findings of Fact and Conclusions of Law.

On the 31st day of March, 1947, Maritime entered into a contract with Autodial. This contract dealt with the manufacturing of twelve units to serve as production models for the subsequent mass production of the teledial device, a mechanical and electrical attachment for telephones, which would automatically dial fifteen pre-selected telephone numbers. The contract was negotiated and executed on behalf of Maritime by its President, Gunther K. E. Kleeberg, and on behalf of Autodial by its President, Ernest F. Mechlin.

Mr. Mechlin had been authorized by the Board of Directors of Autodial on February 3, 1947, to enter into a contract for the manufacture of twelve production models of the teledial, provided that the cost was not to exceed the sum of $10,000, and provided further, that the production of the models was to be completed within six months from the making of the contract. The pertinent provisions of the contract between Maritime and Autodial are quoted in the margin.[1]

---

1. "1. Autodial hereby agrees to place an order on Maritime within five (5) days of the date of this contract for twelve (12) Teledial units and to pay Maritime a maximum of Nine Thousand Dollars ($9,000.00).

"2. Maritime agrees to supply Autodial with the twelve (12) units at cost, said cost to be based on the rate of Three Dollars ($3.00) per hour for tool room and engineering labor and between One Dollar and Fifty Cents ($1.50) and Two Dollars ($2.00) for regular shop labor plus material and services, said costs to be supplied by Maritime to Autodial, and Autodial to pay Maritime either the Nine Thousand Dollars ($9,000.00) or the total of said costs, whichever is less, but in no event shall the payment for the twelve (12) units exceed Nine Thousand Dollars ($9,000.00).

"3. Maritime agrees to furnish the twelve (12) Teledial units to Autodial not later than July 1, 1947. It is understood and agreed by Autodial and Maritime that the delivery date of July 1,

As Mr. Kleeberg subsequently explained in a letter to Mr. Mechlin, dated April 28, 1947, Maritime undertook to develop the teledial in complete readiness for mass production, for a price of nine thousand dollars anticipating that Maritime and Mr. Kleeberg, himself, would give "unstintingly of * * * time and ideas and act as a spark plug to push this program forward at the maximum possible speed and cope with all hurdles and interferences which may come up * * *". Maritime, in so agreeing, was looking forward to the promise of substantial remuneration resulting from the mass production of the teledial since, as Mr. Kleeberg stated, "The only returns we could possibly attain would be through the eventual production in quantity of this unit."

Maritime undertook performance of its contract with Autodial about April 1, 1950, and began work on the contract at its plant, in Belfast, Maine.

As a result of experiments and work by Maritime in the early stages of producing the teledial prototypes, Mr. Kleeberg developed certain ideas pertaining to the re-design of various parts of the teledial for the purposes of simplification and production economy. On various occasions in May, June, and July, these proposals for changes in the teledial were discussed generally and theoretically between Mr. Mechlin and Mr. Kleeberg. It was understood that the suggestions would be embodied in drawings or plans and submitted to Autodial for further analysis.

The only request for any changes in the terms or conditions in the agreement between Maritime and Autodial for the production of twelve prototype teledial units made by Mr. Kleeberg, or by Maritime, prior to September 6, 1947, was a request by Mr. Kleeberg for an extension of the time for performance of the contract, beyond the date of July 1, 1947, which had been set for completion of performance. This request was acquiesced in by Autodial in a letter dated July 3, 1947 in which Autodial stated, "Without waiving our rights under the contract in any way * * * urge you to make all possible haste in the completion of the first of the twelve (12) models."

1947, shall be extended to the extent of any delays caused by Autodial and to the extent of any other delays suffered by Maritime by reason of events which are beyond its control.

"4. Maritime agrees in the construction or production of the said twelve (12) units it will use its best efforts in conjunction with Autodial to refine or improve the construction of the parts of the device to best adapt the same to quantity production and to improve its operation. Such changes must not adversely affect the operation or the sturdiness of the unit. Such changes shall be considered as coming within the price as hereinbefore provided and shall not be charged as an extra by Maritime against Autodial.

"5. The parties further agree that if in the course of the construction of the said twelve (12) units major changes are deemed desirable either by Autodial or by Maritime, such major changes, if suggested by Maritime, shall first be approved in writing by Autodial and only made by Maritime after such approval is received. Maritime shall in advance furnish Autodial with the estimated extra cost of such major changes, and such extra cost, if approved by Autodial, shall be added to the cost of the units as above set forth, even though it may increase the cost to Autodial to more than Nine Thousand Dollars ($9,000.00).

"6. Autodial agrees to pay to Maritime within ten days of the signing of the contract the sum of Six Thousand Seven Hundred and Fifty Dollars ($6,750.00), said sum to be considered as part payment in advance for the said twelve (12) Teledial units, the balance between said sum and the total costs, or the sum of Nine Thousand Dollars ($9,000.00), adjusted so far as necessary to reflect the cost of major changes as above set forth, as the case may be, to be paid to Maritime upon the delivery of the twelve (12) units.

"It is mutually agreed by and between the parties hereto that this initial contract is entered into by Maritime on the assumption that Maritime shall have the right and option after the completion of the said twelve (12) units, subject to the conditions hereinafter set forth, of obtaining a contract from Autodial for the exclusive quantity production of such units as may be required by Autodial to supply its licensees with not less than One Hundred Thousand (100,000) of such units."

Because Autodial, through Mr. Mechlin, had been somewhat upset at the slowness with which Maritime was proceeding under the contract, Mr. Kleeberg had informed Mr. Mechlin as early as May of 1947 that he intended to break the work down into various subassemblies and to spread out the work. Mr. Kleeberg proceeded to turn over work on the various subassemblies of the teledial to outside concerns, including Sandsea, Inc., of Providence, Rhode Island, the Intervenor herein.

On or about June 5, 1947, Mr. Kleeberg, President of Maritime, interviewed Mr. Sandsea, President of Sandsea, Inc., and told him that Maritime was making twelve units called teledial for Autodial; that the job needed a lot of designing done and parts made; and that any pay for the job would have to come from Autodial.

About a week after June 5, 1947, in a telephone conversation, Mr. Kleeberg asked Mr. Sandsea if Sandsea, Inc., could start right away on the work and again told him that Maritime could not finance the job and that Sandsea, Inc., would have to get Autodial in, "because they were the monied people", and that a representative of Autodial would be in Belfast around July 10th, and Mr. Sandsea told Mr. Kleeberg that Sandsea, Inc., could start right away.

Mr. Kleeberg did not tell Mr. Sandsea about any particular contracts entered into between Autodial and Maritime or any of the details thereof.

As a result of the foregoing conference, on June 17, 1947, a purchase order for certain parts for the teledial units was given by Maritime to Sandsea, Inc.; and Sandsea, Inc., started the work called for by such order.

Mr. Sandsea sent Mr. Kunath, Chief Engineer of Sandsea, Inc., to Belfast on July 10, 1947, to meet the representative of Autodial, and to "take care of" the engineering work and also to be sure and "tie in" Autodial "with this work"; because Autodial was ("they were") the "monied people"; and Mr. Kleeberg had already informed him that Maritime couldn't finance the job. In other words, Mr. Kunath was instructed by Mr. Sandsea to plan the engineering and procure assurance from Autodial's representative that Autodial would be responsible for payment for the work to be performed by Sandsea, Inc.

At Belfast, on July 10, 1947, Mr. Kleeberg introduced Mr. Archer Huntington to Mr. Kunath as "the representative of Autodial". No other representation regarding the authority of Mr. Huntington or of his status or connection with Autodial was made to Mr. Kunath. At the conference extending from July 10 to July 12, 1947, Mr. Huntington, purporting to act on behalf of Autodial, and Mr. Kleeberg, acting on behalf of Maritime, entered into an oral agreement with Sandsea, Inc., acting by Mr. Kunath, its Chief Engineer, such agreement being that Autodial and Maritime then and there jointly and severally promised to pay Sandsea, Inc., for work (redesigning of, and manufacture of, certain parts for the teledial units) to be performed by Sandsea, Inc., at the rate of $3.00 per hour.

Although Mr. Kleeberg stated to Mr. Sandsea that Maritime would not be responsible to pay Sandsea, Inc., for work on the teledial devices, Mr. Kleeberg in specifying Maritime's charges against Autodial included the charges of Sandsea, Inc., as an obligation for which Maritime was committed, and in open court, Maritime has asserted that it considers itself obligated and liable to Sandsea, Inc., for all work done by Sandsea, Inc.

On September 15, 1947, Mr. Mechlin and Mr. Sandsea were in Belfast and a conference was had. The details of that conference are fully discussed hereafter.

Both claims against Autodial rest, in part at least, on a purported contract made by Archer S. Huntington, on behalf of Autodial. There is involved in both claims the question whether Mr. Huntington had authority, as agent of Autodial, to bind it to contracts, or to change the terms of its contracts. Autodial denies the existence of any contracting authority in Mr. Huntington. Evidence of statements by Mr. Huntington, and of the agreements purportedly made by him on behalf of Autodial, was received *de bene*, pending deter-

mination by the Court of the questions of agency. Those questions will be considered as they come up, in the discussion which follows.

Mr. Huntington had no actual authority to make contracts on behalf of Autodial. His official function at Belfast was to lend his experience to Maritime in the engineering work necessary for the development and production of the teledial units. In fact, Mr. Kleeberg, President of Maritime, was informed, before the basic contract in issue was executed, that the contracting power was lodged solely in the President of Autodial, who was Mr. Mechlin, acting under the instructions and with the approval of the Board of Directors.

During the year 1947, which includes all times relevant to the present case, Mr. Huntington was the Treasurer, the Secretary, and a Director of Autodial. Mr. Kleeberg knew of Mr. Huntington's status as Secretary and Treasurer, but did not know he was a Director.

Prior to negotiation of the contract between Maritime and Autodial, which is here in issue, Mr. Huntington had handled, on behalf of Autodial, the supervision of work done by Maritime on a motor and gear assembly which was produced for Autodial. There was no evidence that Mr. Huntington executed the contract for that work on behalf of Autodial, or that his responsibilities extended to making changes in that contract. Mr. Huntington also participated in several preliminary discussions with Mr. Kleeberg, prior to the execution of the contract in issue; but the negotiation of the terms of the contract, on behalf of Autodial, was handled exclusively by Mr. Mechlin, its President.

Mr. Huntington was sent by Mr. Mechlin to the Maritime plant at Belfast, arriving about April 14, 1947; and he remained there, except for occasional brief absences, during the spring, summer, and fall of 1947, while the teledial project was in progress. At all times during this period Mr. Huntington was paid by Autodial, and not by Maritime, for his services. During nearly all of this period, Mr. Huntington was the sole official representative of Autodial at the Maritime plant at Belfast, although a Mr. Wydur, from the Autodial staff, was employed in the Maritime payroll, as a draftsman.

Mr. Huntington made reports twice weekly, in writing, to Mr. Mechlin. During all of this period Mr. Kleeberg made regular weekly reports directly to Mr. Mechlin, and not through Mr. Huntington; although Mr. Mechlin frequently sent his answers to Mr. Kleeberg by way of Mr. Huntington. On at least one occasion, Mr. Mechlin sent Mr. Huntington a telegram, ordering him to expedite the work on the teledial project. This telegram was turned over to Mr. Kleeberg by Mr. Huntington.

There was nothing in the course of Autodial's dealings with Maritime, as above related, which entitled Maritime to disregard the known fact that Autodial's contracting authority was lodged exclusively in its President, Mr. Mechlin. There was nothing in Autodial's conduct which entitled Maritime to assume that Mr. Huntington had authority to vary the terms of the written contract between Autodial and Maritime.

Moreover, there is no evidence to indicate that Autodial ratified any purported change made by Mr. Huntington in the contract with Maritime. No proof was offered that Maritime's purported reliance on Huntington's assurances was known to Autodial or that Autodial ratified those assurances by its silence.

As to Maritime, therefore, evidence of Mr. Huntington's statements is inadmissible to prove changes in the terms of the contract.

Maritime urges, nevertheless, that it is entitled to recover from Autodial the value of the work handled by Maritime on its contract. Maritime's position in this respect is that Autodial permitted and even encouraged it to embark on a broad program of extensive changes in the teledial device, necessitating costly engineering work, and ought, therefore, to be required to pay the cost of the work involved.

The contract under which Maritime was working made express provision for additional payments for "major changes" in

the teledial device, upon certain reasonable conditions. Those conditions were that Maritime should furnish Autodial, in advance, with an estimate of the extra cost of such major changes, and that Autodial should give written approval of the changes and the estimated cost, before Maritime undertook the extra work. Maritime never, in any letter to Autodial, or conference with Autodial, referred to any of the work it was doing as a "major change", and never submitted to Autodial an estimate of additional cost for such work. Only on September 6, 1947, just prior to the conference of September 15th, did Maritime submit a statement of the expenses already incurred by it, and then only as "a basis of our further discussion."

The only specific discussion between the parties in that regard was at the September conference, and concerned an offer by Mr. Mechlin to Mr. Kleeberg to increase the contract price from $9,000 to $14,000. That offer was rejected by Mr. Kleeberg, and later was disavowed by the Board of Directors of Autodial.

The contract in issue plainly contemplated that Maritime would make changes of a minor nature to facilitate production of the teledial. The contract also contemplated that Maritime would have the opportunity to get a profitable contract for the mass production of the teledial unit, once the twelve pilot models were completed. Autodial, as far as the evidence shows, was legally entitled to assume that Maritime was continuing to operate under the original contract, even though at a substantial loss, right up until the time when Maritime stopped its work, leaving the project unfinished. As a result, even on a quantum meruit basis, Maritime is entitled to nothing from Autodial.

■ Furthermore, having failed to fulfill its contract, Maritime is not entitled to damages for any loss of the anticipated opportunities to engage in the profitable mass production of the units at a future date. Such loss is, at best, a highly speculative item of damage, and the point was not seriously argued by counsel for Maritime. This Court finds that Maritime, and the Reconstruction Finance Corporation as assignee of Maritime's interest in the contract, are not entitled to recover from Autodial any part of the counterclaim for damages in the present action.

Sandsea, Inc., is in a somewhat different position from Maritime. During the times in question, only Mr. Sandsea, President, and Mr. Kunath, Engineer, of Sandsea, Inc., had any direct dealings with officers of Maritime or Autodial. In contrast to Mr. Kleeberg, neither Mr. Sandsea nor Mr. Kunath had any knowledge or information with respect to the existence or terms of the contract between Autodial and Maritime. Neither man was informed, as was Mr. Kleeberg, of Mr. Huntington's official connection with Autodial, beyond the fact that Huntington was the "representative" of Autodial at the Maritime plant. Neither man from Sandsea, Inc., knew anything of Mr. Huntington's business relationship with Mr. Mechlin. As to Sandsea, Inc., therefore, there is a complete lack of evidence, either that Sandsea, Inc., was to be charged with knowledge of limitations on the outside cost of the teledial project, or that Mr. Huntington had any apparent authority, initially, to bind Autodial to contracts with Sandsea, Inc. As has been noted, Mr. Huntington had no actual authority, which, though hidden from Sandsea, Inc., could give force to his commitments on behalf of Autodial. Therefore, without ratification of Mr. Huntington's acts by Autodial, or by someone apparently authorized to ratify those acts, Sandsea, Inc., was not entitled to rely on any statements of a contractual nature made by Mr. Huntington to Mr. Kunath at the conference at Belfast on July 10, 11, 12, 1947.

The case of Sandsea, Inc., against Autodial, therefore, turns upon this Court's findings of fact with reference to the conference of September 15, 1947. The testimony in some respects is contradictory, but the following facts emerge from the evidence.

Mr. Mechlin and Mr. Sandsea arrived at Belfast September 15, 1947. Mr. Sandsea knew that Mr. Mechlin would be there at that time. Mr. Mechlin did not know that Mr. Sandsea would be there. The two men

were introduced by Mr. Kleeberg, and identified to each other as President of Autodial and President of Sandsea, Inc., respectively. Mr. Huntington and Mr. Kenneth Button, Assistant Treasurer of Maritime, were also present for parts of the meeting. In the morning of September 15th, the group went around the shop while Mr. Kleeberg showed Mr. Mechlin the jobs Maritime was doing, and then went into the engineering room for conversations on the progress of the teledial project.

After an interlude for lunch the discussions resumed. It is agreed that the discussions eventually became acrimonious, that Mr. Huntington left the conference at Mr. Mechlin's request, and that Mr. Sandsea subsequently left before the conference was terminated. There is a sharp conflict in the testimony, however, as to important details of the conversations. Mr. Sandsea and Mr. Kleeberg both stated that Mr. Mechlin requested Mr. Sandsea to have his company push its work as rapidly as possible. Mr. Mechlin denies making any such request. All three witnesses, including Mr. Mechlin, testified that Mr. Mechlin examined the bills of Sandsea, Inc., for work done on the project.

The witnesses, including Mr. Mechlin, are in agreement that, subsequent to Mr. Huntington's departure from the room, Mr. Sandsea broke into the argument between Mr. Mechlin and Mr. Kleeberg, and stated that, regardless of the dispute between the other two men, Sandsea, Inc., must be paid for its work.

Mr. Sandsea states that Mr. Mechlin thereupon responded, "Don't worry about it; you will get paid." Mr. Kleeberg confirms that statement. Mr. Mechlin denies it. It is agreed by all three men that Mr. Sandsea excused himself from the conference shortly after his interruption, as above noted. It is clear that he returned to his plant at Providence;

and there is no dispute that Sandsea, Inc., continued to bend its efforts to complete its work on the teledial project, for a period of nearly two months thereafter.

The testimony of Mr. Sandsea and Mr. Kleeberg as to the crucial points of the September 15th conference is confirmed by the testimony of the Assistant Treasurer of Maritime, Mr. Button, who was present during the relevant part of the conversations.

This Court has given consideration to the relative credibility of the testimony of the three key participants of the September 15 conference. All three men, Mr. Kleeberg, Mr. Mechlin, and Mr. Sandsea, were interested witnesses, in the sense that they would naturally seek to justify their own positions in the matters in dispute. The evidence showed that Maritime has ceased to do business, but that Mr. Kleeberg is still its President and is personally liable as a signer on Maritime's note to the Reconstruction Finance Corporation. Mr. Mechlin is, likewise, still the President and a stockholder of Autodial. On the other hand, Mr. Sandsea had left Sandsea, Inc., before this action was brought, and is now employed with another company.

■ Mr. Kleeberg's testimony showed him to be a man without too much business judgment; but he impressed the Court with his frank and prompt answers on the witness stand. This Court was particularly impressed with the appearance of Mr. Sandsea as a witness. He appeared to be honest, frank, and forthright throughout his testimony, which bore all the earmarks of truth. In contrast, Mr. Mechlin was an evasive witness, whose memory was particularly accurate on matters which were beneficial to his company, but exceedingly vague when he was confronted with situations and events that would not help his cause. His lack of frankness as a witness was far from commendable. [2] This

---

2. The following excerpts from the cross-examination of Mr. Mechlin may be cited as illustration of Mr. Mechlin's complete lack of frankness with the Court.
"Q. Who was Mr. Huntington, Mr. Mechlin? A. Huntington was a broth-

er-in-law of one of the directors of the Automatic Dialing Corporation.
"Q. Was he the secretary and treasurer of the company? A. He was.
"Q. He was? A. Ostensibly, he was.

Court can place but little credence in any testimony Mr. Mechlin gave on disputed facts in this case. This Court considers that Mr. Sandsea's version of the September 15th conference, substantially concurred in by Mr. Kleeberg, is a true statement of what happened there. This conclusion is strongly supported by subsequent events—namely, the continuation by Sandsea, Inc., of work on the project for a number of weeks following the September 15th conference at Belfast.

■ The remaining issues relate to the legal effect of Mr. Mechlin's statement that Sandsea, Inc., would be paid.

Mr. Mechlin was the president of Autodial. Unknown to Mr. Sandsea, Mr. Mechlin had actual authority from the Board of Directors of Autodial to conclude contracts for the manufacture of the twelve teledial units, at a cost not to exceed $10,000. The limitations on Mr. Mechlin's authority, with respect to approval of his acts by the Board of Directors of Autodial, and with respect to the maximum cost, were unknown to Mr. Sandsea. Mr. Mechlin had active charge of the teledial project, and was acting in that capacity at the September 15th conference. Mr. Mechlin's promise was made in the ordinary course of the business of Autodial. In spite of the actual limitation on Mr. Mechlin's authority, Mr. Sandsea had the right to assume, without knowledge to the contrary, that Mr. Mechlin, as President of Autodial, had authority to bind Autodial to reasonable contracts with respect to the production of the teledial units. Portland Motor Sales Co., Inc. v. Millett, 1925, 124 Me. 329, 128 A. 694; Mitchell v. Canadian Realty Co., 1922, 121 Me. 512, 118 A. 373. Mr. Mechlin had apparent authority, as President of Autodial, to bind his company to such contracts; and, therefore, Auto-

I think I've got the right to say what position he held and why he held it.

"The Court: Just answer the question. We will get to that.

"Mr. Peabody: I think 'ostensibly' might be stricken. He either was the secretary and treasurer or he wasn't.

"The Court: Strike that.

"Q. He was the secretary and treasurer, was he not, Mr. Mechlin? A. He held that title.

"Q. He had been elected, had he not? A. He had."

(Record, 576–577).

"Q. Do you know anything else about Mr. Huntington's activities in Belfast, or what he was doing, that might shed further light on his position here? A. Mr. Huntington was given the only paying position in the Automatic Dialing Corporation because he was out of work and he was used as an engineer by reason of his ability as a mechanic, and Mr. Kleeberg was perfectly well aware of Mr. Huntington's limitations, and the reason I sent him to Belfast.

"Q. Well, do you think, we now have a sufficient picture of Mr. Huntington in Belfast?

"Mr. Wernick: If the Court please, may I state, it is not for Mr. Mechlin to judge whether the Court has a sufficient picture. .

"Mr. Richards: All right. Strike it out.

"Mr. Wernick: I would like to have it stay.

"Mr. Richards: Which way do you want it?

"Mr. Wernick: I didn't ask that it be stricken.

"The Court: I will order it stricken.

"Q. Is there anything else you want to tell us about Mr. Huntington? A. No.

"Q. Why don't you tell us he was a director of the company throughout this entire period?

"Mr. Wernick: If Your Honor please, he has already told him that.

"Mr. Richards: Never once.

"Mr. Wernick: I ask the Court to refer to the testimony given by Mr. Mechlin practically at the inception of the cross examination by Mr. Peabody.

"Mr. Richards: I think we should. He has never stated it. We will refer to it right now.

(Reporter refers to testimony commencing with cross examination of Mr. Mechlin by Mr. Peabody).

"Q. Why haven't you told us that this man, Mr. Huntington, concerning whom we had testimony for several days, during the course of this trial, was a director of Automatic Dialing Corporation throughout the entire year of 1947? A. Because I have never been asked that question.

"Q. Well, I am asking you now. Was he a director throughout the year 1947? A. He was."

(Record 603–605).

dial should be bound by Mr. Mechlin's promise to Mr. Sandsea in that regard.

The work of Sandsea, Inc., was for the benefit of Autodial. If proof is needed, it can be found in Mr. Mechlin's request of Mr. Sandsea that the work be carried forward by his company as fast as possible. The product of the previous work by Sandsea, Inc., had been forwarded to Autodial by Maritime, though with Sandsea's name deleted. The work done by Sandsea, Inc., subsequent to the September conference has likewise been received by Autodial and has been retained by it.

Mr. Mechlin testified that at the September 15th conference, in the presence of Mr. Sandsea, "I told Mr. Kleeberg that Mr. Sandsea was a stranger to the contract, that I had no knowlege of Sandsea having done anything, * * *." The evidence clearly demonstrates that Mr. Huntington was sent to Belfast to assist in the engineering end of the project; that Mr. Huntington was Secretary, Treasurer, and a Director of Autodial; that he was present during the entire conference for three days in July, 1947, with Mr. Kleeberg of Maritime and Mr. Kunath of Sandsea, Inc., and that throughout his stay in Belfast, Mr. Huntington reported to Mr. Mechlin at least twice a week, in writing, on the current status of the teledial project. It is the fair inference from those facts that Mr. Huntington conveyed to Mr. Mechlin an account of what transpired at the three-day conference. Moreover, it is reasonable to conclude that Mr. Huntington, in his capacity as Autodial's engineering representative, inspected the completed portions of the job as Sandsea, Inc., forwarded them to Maritime, and kept Mr. Mechlin informed of all developments. In view of the demonstrated facts, and the natural inferences to be drawn therefrom, this Court considers that the testimony of Mr. Mechlin, that he knew nothing of Sandsea, Inc., or its work on the project, is unworthy of credence.

But whether or not Mr. Mechlin's statement in that regard is true, it is clear that Mr. Mechlin was fully informed, in the early part of the talks on September 15th, of the nature and amount of work done by Sandsea, Inc., to date. It is also established that Mr. Mechlin gave careful consideration to the amount of the bills from Sandsea, Inc., prior to making his statement that Sandsea, Inc., would be paid.

Consideration for Mr. Mechlin's promise, if consideration be necessary, may be found in the work of Sandsea, Inc., continued thereafter, to work out the production problems involved in the teledial unit.

Moreover, all the elements are present to establish that Mr. Mechlin, as a matter of law, could and did ratify, on behalf of Autodial, the promises made by Mr. Huntington to Mr. Kunath of Sandsea, Inc., at the conference at Belfast on July 10, 11, and 12, 1947. Mr. Huntington purported, though without actual or apparent authority, to bind Autodial to a contract with Sandsea, Inc., for work on certain parts of the teledial device. The contract called for Sandsea, Inc., to do that work at a price of three dollars per man-hour, without any ceiling on cost. The contract was for Autodial's benefit, particularly in view of Autodial's urgent need for the twelve production units; and the contract was one which Autodial could have authorized at that time. As noted, Mr. Mechlin was aware of all the facts when he told Mr. Sandsea he would be paid; and, furthermore, Mr. Mechlin indicated to Mr. Sandsea that his company should continue to work on the same basis. Finally, as noted, Mr. Mechlin had apparent authority to approve such a contract with Sandsea, Inc.

In view of the ratification by Mr. Mechlin, evidence of Mr. Huntington's statements to Mr. Kunath at the conference of July 10, 11, and 12, made in his purported capacity as agent of Autodial, are admissible in evidence with respect to the claim of Sandsea, Inc., against Autodial. That evidence has been considered by the Court in that connection.

Autodial's obligation to Sandsea, Inc., is, therefore, an obligation on Autodial's own contract, and not on a promise to pay the debt of Maritime, which would bring the case within the Statute of Frauds.

Autodial is obligated to pay the reasonable value of the work done by Sandsea,

Inc., on the teledial project. No issue has been raised as to the quality of its work, or the fairness of its charges. This Court finds that the charges shown by Sandsea, Inc., are entirely fair and reasonable. Sandsea, Inc., does not press, as against Autodial, its claim for work done prior to July 12, 1947, which work amounted to $359.25, even though that work was of value to Autodial. As previously noted, Maritime has admitted its liability to Sandsea, Inc., for the full amount of the work done by Sandsea, Inc., on this project, and this Court now finds as a fact that Maritime is obligated to Sandsea, Inc., in that amount. Therefore, Sandsea, Inc., is entitled to judgment against Maritime for $359.25, the value of the work done by Sandsea, Inc., before July 12, 1947, and against Maritime and Autodial, jointly and severally, for $14,827.62, the value of the work done by Sandsea, Inc., on and after July 12, 1947.

Sandsea, Inc., also claims, from Maritime and Autodial, jointly and severally, interest on its charges from the dates its bills were submitted to Maritime. This Court, after considering all the circumstances of the case, considers that no interest should be allowed to Sandsea, Inc., on its claim against either Autodial or Maritime prior to the date of judgment.

For the reasons stated, it is Ordered, Adjudged and Decreed, that the Reconstruction Finance Corporation, a corporation duly organized and existing, under and by virtue of an Act of Congress, and having a place of business at Boston, Massachusetts, be and hereby is brought in as a defendant in the present action; and that judgment be and hereby is entered,

(a) for the Plaintiff, Automatic Dialing Company, on the counterclaim of Defendants, Maritime Quality Hardware Company and the Reconstruction Finance Corporation;

(b) for the Intervenor, Anchor Tool and Die Company, formerly Sandsea, Inc., against the Plaintiff, Automatic Dialing Company and against the Defendant, Maritime Quality Hardware Company, jointly and severally, for the principal sum of $14,827.62, without interest,

(c) for the Intervenor, Anchor Tool and Die Company, against the Defendant Maritime Quality Hardware Company, for the additional principal sum of $359.25, without interest.

It is further ordered that the Clerk of this Court file, and enter this Opinion and Order forthwith, and that conformed copies thereof be mailed to all parties to the action, or their counsel of record.